# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

REMIGIO MELENDREZ and
MISTY MELENDREZ, husband
and wife,

      **Plaintiffs,**

      v.                                 **CIV. NO. 04-395 ACT/RHS**

PUBLIC SERVICE COMPANY OF NEW
MEXICO ALBUQUERQUE, a New Mexico
corporation; and CHUCK ARATER, an
individual,

      **Defendants/ Third Party Plaintiffs,**

      **v.**

AMERICAN GUARANTEE AND LIABILITY
COMPANY, THATCHER COMPANY OF
ARIZONA, and MARSH USA INC.,

      **Third Party Defendants.**

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on cross Motions for Summary Judgment. Third

Party Defendant Thatcher Company of Arizona ("TCA") filed its Motion for Summary Judgment on

March 16, 2005. [Docket No. 94]. TCA seeks summary judgment on two claims: 1) breach of

contract for its failure to indemnify and defend Public Service Company of New Mexico and Chuck

Arater ("PNM") from Plaintiff's personal injury claims; and 2) breach of contract for its failure to

purchase and maintain insurance to cover PNM for PNM's negligence. PNM filed its motion for

summary judgment on April 1, 2005. [Docket No. 111]. PNM is seeking summary judgment on

three claims:  1) TCA's breach of contract for failure to obtain and maintain comprehensive general liability insurance, or its equivalent, including endorsing PNM as an additional insured; (2) TCA's breach of contract for failure to require its subcontractor, B. J. Cecil Trucking, Inc. ("Cecil Trucking"), to obtain insurance required by the Purchase Agreement; and (3) TCA's breach of contract for failure to defend and acknowledge its duty to indemnify PNM for claims made against PNM by Plaintiffs.  The Court finds that TCA's Motion is not well taken and will be denied and that PNM's Motion is well taken and will be granted in part.


### Factual and Procedural History

TCA and PNM entered into a Purchase Agreement whereby TCA was to provide sulfuric acid to PNM at its Reeves Station Power Plant.  TCA hired Cecil Trucking to deliver sulfuric acid to PNM.  Plaintiff, Remigio Melendrez, was an employee of Cecil Trucking.  He delivered sulfuric acid to PNM at the Reeves Station on April 11, 2001.  In his Complaint filed April 9, 2004, Plaintiff Melendrez and his wife allege claims against PNM for personal injuries which occurred during the course of that delivery.

On October 15, 2004, PNM and Arater filed a First Amended Third Party Complaint ("First Amended Third Party Complaint") against, *inter alia*,  Thatcher. [Docket No. 29] .  PNM alleges that Thatcher breached the Purchase Agreement in failing to purchase and maintain comprehensive general liability insurance providing coverage for, among other things, bodily injury ("CGL insurance") and for not including PNM as an additional insured.  PNM further alleges that Thatcher's refusal to defend and indemnify PNM  is a breach of the Purchase Agreement. [Docket No. 29, ¶¶ 13-16, 60-64].  In a Second Amended Third Party Complaint [Docket No. 138] filed May 13, 2005,

PNM added allegations that TCA failed "to use vehicles and equipment compatible with the safe transportation, delivery, and unloading of sulfuric acid ..."  Second Amended Third Party Complaint, Count VI, ¶ 68.

> 1.     *Purchase Agreement.*

It is undisputed that PNM and TCA entered into the "Technical Grade Sulfuric Acid Purchase Agreement" ("Purchase Agreement") effective December 1, 1998.  The Purchase Agreement states in part:

1.     Contractor agrees to assume full liability for and agrees to protect, defend, indemnify, and save PNM harmless from any injury, death, loss, damages, claims, expenses (including reasonable attorney fees), suits, demands, judgments and causes of action of any nature arising or alleged to have arisen as a result of operations hereunder by Contractor, including negligence, willful misconduct, and strict liability in tort.  This indemnity provision shall apply equally to injuries to Contractor's employees.

Purchase Agreement, ¶10.

2.     Without limiting any liabilities or any other obligations of Contractor, Contractor shall unless otherwise approved in writing, provide and maintain, with forms and insurers acceptable to PNM, until all the obligations under this Contract are satisfied, the minimum coverage as follows:

> Comprehensive General Liability Insurance, or equivalent, with a minimum combined     single limit of One Million Dollars (1,000,000.00) each occurrence. The policy shall  include coverage for bodily injury liability, broad form property damage liability, blanket contractual, contractor's protective, and products and completed operations.  Where applicable, the policy shall include coverage for the hazards commonly referred to as XCU.

*Id*. at ¶¶ 20.0 and 20.2.

       3.     The policies required by paragraph 20.2 of this ARTICLE shall be endorsed to include PNM as additional insured.

*Id*. at ¶ 20.4.

       4.     Prior to commencing Services, Contractor shall furnish PNM with Certificates of Insurance as evidence that policies providing the required coverage, conditions, and limits are in full force and effect. . . .

*Id*. at ¶ 20.5.

       5.     Contractor shall require that each subcontractor comply with insurance requirements as set forth herein.

*Id*. at ¶ 20.7.

       2.     *"Thatcher Company of Arizona Product Liability Trust."*

When PNM requested that TCA provide certificates reflecting TCA's satisfaction of the insurance obligations imposed by the Purchase Agreement, PNM received a letter dated January 12, 2000, with an attached letter of January 1, 2000, from First Security Bank which confirms that the "Thatcher Company of Arizona Product Liability Trust" is "in full force and effect." PNM's Memorandum Brief in Support, Exhibit B-7 and B-8. The January 1, 2000, letter further states that "Trust funds may only be used to satisfy Product Liability and Comprehensive claims." PNM's Memorandum Brief in Support, Exhibit B-8. The January 1, 2000, letter is substantially identical to letters dated July 28, 1998, January 1, 2002, January 2, 2004, and April 29, 2004, except that this latter letter states that "Public Service Company of New Mexico, its officials and employees are hereby named as additional insured's [sic] and certificate holders to the Thatcher Company Product

Liability Trust."  Exhibits B-1, B-13, B-16 and B-19.

Craig Thatcher ("Thatcher"), president of TCA and Thatcher Chemical Company, a Utah

corporation, testified at his deposition taken on January 27, 2005, that at the time of the accident,

April 11, 2001, the only trust in effect was the one dated July 10, 1986 ("Trust Agreement of 1986").

PNM's Memorandum in Support, Exhibit D

Pursuant to this Trust Agreement, Thatcher Chemical Company, a Utah corporation, is the "Trustor"

and First Security Bank of Utah is the "Trustee."  PNM's Memorandum in Support, Exhibit C.  There

is a subsequent Trust Agreement dated April 8, 2003 ("Trust Agreement of 2003").  TCA's

Response, Exhibit C.


## Legal Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue of

material fact, and the moving party is entitled to judgment as a matter of law. *Celotex v. Catrett,* 477

U.S. 317, 322 (1986).  The opposing party may not rest upon mere allegations and denials in the

pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  An issue of fact is genuine if the evidence is

significantly probative or more than merely colorable such that a jury could reasonably return a

verdict for the non-moving party.  *Id.* at 248.  Mere assertions or conjecture as to factual disputes

are not enough to survive summary judgment. *Branson v. Price River Coal Co.*, 853 F.2d 768, 771-

72 (10th Cir. 1988).

**Discussion**.

1.    *TCA breached the Purchase Agreement in not obtaining the required insurance.*

It is undisputed that the Purchase Agreement required TCA to procure comprehensive general liability insurance, or its equivalent, with PNM named as an additional insured.  TCA contends that either the Trust Agreement of 1986 or the Trust Agreement of 2003 fulfills this obligation.

The plain meaning of the words in the Trust Agreements determine whether the Trust Agreements fulfill TCA's duty under the Purchase Agreement to provide CGL insurance.  *Healthcare Am. Plans, Inc., v. Bossemeyer*, 953 F. Supp. 1176 (D. Kan. 1996) ("We 'construe terms in trust agreements without deference to either party's interpretation," (citation omitted) and in accordance with 'common sense canons of contract interpretation,'" (citation omitted)); *Kansas State Bank & Trust Co. v. Old Am. Ins. Co*., 491 F.2d 307, 309-10 (10th Cir. 1974) (words used in an insurance policy are to be understood in terms of their ordinary, plain meaning).

The Trust Agreement of 1986 identifies Thatcher Chemical Company, a Utah corporation, as the Trustor.  The beneficiaries are the Trustor,  "any person or persons" who asserts a products liability claim against the Trustor, and any person or persons who obtain(s) a judgment based on a product liability claim against the Trustor.  Contingent beneficiaries are persons who assert a products liability claim against the Trustor.  The terms in the Trust Agreement of 2003 are materially identical to the terms in the Trust Agreement of 1986.

Read in their plain terms the Trust Agreements apply solely to Thatcher Chemical Company, a Utah corporation. The Trusts do not cover any claim against TCA.  They do not identify either TCA or PNM as beneficiaries or contingent beneficiaries.  The Trusts do not name PNM as an

additional insured.

TCA relies on the testimony of Thatcher that he intended to meet TCA's Purchase Agreement obligations through the Trust Agreements. Thatcher's testimony concerning what he intended does not create an ambiguity in the terms of the Trust Agreements. *Hoggard v. City of Carlsbad*, 121 N.M. 166, 170, 909 P.2d 726, 730 (Ct. App. 1995) ("As a matter of law, one party's subjective impressions, innermost thoughts, or private intentions, do not create an ambiguity."); *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000 NMSC 33, 12 P.3d 960, 965, 129 N.M. 698 (2000) ("a party's statements of unilateral, subjective intent, without more, are insufficient to establish ambiguity in light of the clear contract language."). Thatcher's deposition testimony about the relationship between the Purchase Agreement and the Trust Agreements does not create an issue of fact. *Hansen v. Ford Motor Co.*, 120 N.M. 203, 206, 900 P.2d 952, 955 (1995) (holding that a party's deposition testimony about her unilateral, subjective intent was insufficient to establish an ambiguity in a release).

Other courts have granted summary judgment for failure to procure insurance in similar circumstances. *Seabed Harvesting, Inc. v. Department of Natural Res.*, 114 Wn. App. 791, 60 P.3d 658 (Ct. App. 2002) (reversing denial of summary judgment where defendant failed to procure and maintain comprehensive general liability insurance naming the Department as an additional insured and Department was sued for negligence.); *Montgomery Elevator Co. v. Tuality Comm. Hosp., Inc.*, 101 Ore. App. 299, 790 P.2d 1148 (Ct. App. Ore. 1990) (reversing summary judgment for party who failed to procure comprehensive general liability insurance protecting plaintiff from personal injury claims, noting that if the defendant had abided by the agreement and obtained the insurance for which the plaintiff had bargained, then the insurer would have been responsible for any claim that

occurred.).

Finally, TCA contends that it obtained a trust in lieu of CGL insurance with the approval of PNM. TCA's Contentions, IPTR p. 9 and TCA's Response, p. 3-4, ¶ 12. This contention fails. As discussed above, neither of the Trust Agreements referred to by TCA covers TCA or PNM.

2.   *Affirmative Defenses of waiver, estoppel and ratification and lack of mutual assent*

In its Answer to Amended Third Party Complaint, TCA raises the affirmative defenses of waiver, estoppel, ratification and lack of mutual assent. These four defenses require knowledge on the part of PNM. *Beneficial Fin Co. of New Mexico v. Alarcon*, 112 N.M. 420, 424, 816 P.2d 489, 493 (1991); *Maynerich v. Little Bear Enters., Inc.*, 82 N.M. 650, 651, 485 P.2d 984, 985 (Ct. App. 1971). It is uncontroverted that PNM did not know that the "Thatcher Company of Arizona Product Liability Trust" did not exist or that the Trust Agreement of 1986 did not cover TCA or PNM until the deposition of Thatcher taken on January 27, 2005. PNM's Memorandum In Support, Exhibit D, pp. 69-95, 109, 112 and 114-116. These affirmative defenses will be stricken.

3.   *TCA breached the Purchase Agreement requirement to defend PNM and its duty to indemnify PNM for the causes of action in this matter that arise as a result of TCA "operations."*

Paragraph 10 of the Purchase Agreement is the indemnity provision. PNM contends that the language of Paragraph 10 requires TCA to indemnify PNM against PNM's own negligence. TCA contends that Paragraph 10 covers only TCA's conduct.

Under New Mexico law, an enforceable agreement to indemnify against the indemnitee's own negligence must be "clear and unequivocal." *Metropolitan Paving Co., Inc. v. Gordon Herkenhoff & Assoc., Inc.*, 66 N.M. 41, 341 P.2d 460 (1959). However, an express reference to the

8

indemnitee's own negligence is not required to express such an intent.  *Id.*  The Court in *Metropolitan Paving* held that the following language indemnified the indemnitee against its own negligence:

> The Contractor hereby expressly binds himself to indemnify and save harmless the City and its Engineer from all suits and actions of every nature and description brought against the City or any person or persons <u>on account of the construction of this work</u>....(emphasis added).

*Id.* at 44, 341 P.2d at 461.

The Purchase Agreement contains similar but not identical language:

> Contractor agrees to assume full liability for and agrees to protect, defend, indemnify and save PNM harmless from any injury, death, loss, damage, claims, expenses...suits, demands, judgments and causes of action of any nature arising or alleged to have arisen <u>as a result of operations</u> hereunder by Contractor, including negligence, willful misconduct, and strict liability tort (emphasis added).

Purchase Agreement, ¶ 10.

The Court finds that the language "as a result of operations hereunder by Contractor"  is no less clear and unequivocal than the words "on account of the construction of this work" relied upon by the New Mexico Supreme court in *Metropolitan Paving*.

"As a result of operations hereunder by the Contractor" is inclusive language meaning all operations that are occurring as a result of the performance of the contract, not just those operations actually being conducted by the Contractor.

If the Court were to find, as a matter of law, that the indemnification clause only required TCA to protect PNM for vicarious claims made against PNM for TCA's own operations and negligence, the clause would be superfluous in light of the contract as a whole.  Another paragraph

9

of the Purchase Agreement states in part:

> [TCA] shall be an independent contractor with respect to the performance of all work entered into hereunder and neither Contractor nor anyone used or employed by Contractor shall be deemed for any purpose to be an employee, agent, servant or representative of PNM in the performance of any work in any manner dealt with hereunder.

Purchase Agreement, ¶ 11.

This provision precludes consideration of TCA as PNM's employee, agent, servant or representative. Moreover, New Mexico law prohibits PNM for being liable for the wrongful acts or omissions of its independent contractor TCA. N.M. U.J.I. 13-404 (2005) ("One who employs an independent contractor is not liable to others for the wrongful acts or omissions of the contractor.").

PNM's interpretation is the only interpretation that makes sense. As stated by one court:

> It is commonly understood that insurance of the type contemplated in the purchase agreement is purchased to protect the named insured from the financial consequences of its own negligence. ... Individuals understand that insurance will protect them against the consequences of their own negligence and more than likely assume that if one .... agrees as part of his or its [contractual] duties to provide insurance, that the insurance will protect both of them regardless of the cause of the loss .... If that were not their intent, each would provide his or its own protection ... (citations omitted).

*Pickhover v. Smith's Mgmt. Corp.*, 771 P.2d 664, 668-69 (Utah Ct. App. 1989).

Under the standard set in *Metropolitan Paving,* Paragraph 10 clearly and unequivocally protects PNM even if the claim arises from PNM's negligence in the course of the operations conducted pursuant to the Purchase Agreement. Other courts have applied this same standard to similar fact situations. *Certain London Market Ins. Cos. v. Pennsylvania Nat. Mut. Cas. Ins. C*o., 269 F. Supp. 2d 722, 728-29 (S.D. Miss. 2003); *Public Service Co. of Colo. v. United Cable Tele of JeffCo., Inc.*, 829 P.2d 1280 (Colo. 1992). Recent case law notes that there is a trend toward liberalization of standards governing enforcement of indemnification provisions. *Public Service Co.*

*of Colo.*, 829 P.2d at 1285; *Union Electric Co. v. Southwestern Bell Tele. Co.*, 378 F.3d 781, 786 (8th Cir. 2004).

TCA's reliance on *Berlangieri v. Running Elk Corp.*, 2003-NMSC-024, 134 N.M. 341 (2003), is misplaced. *Berlangieri* involved a liability release signed by a guest. After an accident the injured guest contended that the release was unenforceable as against public policy. The Supreme Court in *Berlangieri* was construing a release rather than an indemnification agreement. The standard stated for the enforcement of a release is

> . . . for the strict construction of liability releases that requires such clarity that a person without legal training can understand the agreement he or she has made. Context is important; the words surround the portion being construed and the circumstances surround the agreement are relevant.

*Berlangieri*, 124 N.M. at 351.

In addition, the court in *Berlangieri* quotes the Metropolitan Paving "clear and unequivocal" standard with approval. *Id.* at 29, 134 N.M. at 350.

TCA also relies on *Conant v. Rodriquez,* 113 N.M. 513, 516, 828 P.2d 425, 428 (Ct. App. 1992). The issue in *Conant* was the enforceability of a release, not an indemnity agreement.

TCA also contends that *Metropolitan Paving* has been superceded by New Mexico's Construction Anti-Indemnity Act, § 57-6-1. Section 56-7-1 does not apply to this matter. Section 56-7-1 voids certain indemnity provisions in construction contracts. As defined in the statute a "construction contract"

> means a public, private, foreign or domestic contact or agreement relating to construction, alteration, repair or maintenance of any real property in New Mexico and includes agreements for architectural services, demolition, design services, development, engineering   s e r v i c e s , excavation other improvement to real property, including buildings, shafts, wells   and structures, whether on, above or under real property.

§ 56-7-1 NMSA 1978.

This statute simply does not apply to an agreement for the purchase and sale of sulfuric acid.

Finally, TCA contends that the Oilfield Anti-Indemnity Act, § 57-6-2 applies. Section 57-6-2 applies to agreements "pertaining to a well for oil, gas or water, or mine for a mineral..." This case does not involve an oil field well or a mining operation. This statute does not apply to an agreement for the purchase and sale of sulfuric acid.

The Court's finding that TCA breached its requirement to indemnify and defend PNM is limited, however, by the following. The Purchase Agreement provides that TCA will indemnify and defend PNM for causes of action that arise "as a result of operations...by Contractor [TCA]." Purchase Agreement, ¶ 10. The Court finds that TCA has failed to indemnify and defend PNM to the extent that Plaintiffs' claims arise from the "operations" that were being conducted in the course of the performance of the contract by TCA. However, the facts before the Court are insufficient to determine whether all of the claims and causes of action alleged by Plaintiffs in the lawsuit arise from "operations" that were being conducted in the course of the performance of the contract by TCA. The Court notes and PNM does not dispute that Plaintiffs' claims include the following:

- Because of the possibility that the eyes or body of any person might be exposed to injurious corrosive materials such as sulfuric acid at its facilities, Defendant PNM had an obligation under the applicable OSHA regulations to provide suitable facilities for immediate emergency use by a person needing to quickly drench or flush his eyes and body.

- Defendant PNM failed to provide suitable facilities for emergency use by a person needing to quickly drench or flush his eyes and body.

IPTR p. 4, ¶¶ 1 and 2.

TCA has alluded to opinions from Plaintiffs' expert witness on liability that PNM was in violation of

federal work place safety legislation and associated regulations, including specific regulations contained in 29 CFR 1910 OSHA standards. TCA also claims that Plaintiffs' expert has stated an opinion that the emergency shower failed to comply with Section 4.2 of the American National Standard for Emergency Eyewash and Shower Equipment, ANSI Z358.1 (1998). TCA's Memorandum in Support, p. 3. TCA does not maintain that these are undisputed material facts, but if there is evidence to support these opinions and Plaintiffs' allegations referred to above, there may be a material issue as to whether all of Plaintiffs' claims resulted from "operations" being performed under the Purchase Agreement as opposed to acts or failures to act on behalf of PNM that preceded the signing of the Purchase Agreement. Therefore, the Court cannot determine at this time whether all of Plaintiffs' claims result from "operations" that were being conducted in the course of the performance of the contract by TCA and thus covered by the indemnity provisions of the Purchase Agreement.

  4.   *TCA breached Paragraph 20.7 which requires that TCA require its subcontractors comply with the insurance requirements of the Purchase Agreement.*

  It is uncontroverted that B.J. Cecil Trucking was TCA's subcontractor. Pursuant to ¶ 20.7 of the Purchase Agreement, TCA "shall require that each subcontractor comply with insurance requirements as set forth herein." TCA admitted to this contractual requirement. TCA's Response, p. 3 ,¶ 7. Although TCA discusses whether it had a duty to provide insurance or its equivalent to protect PNM, TCA in its Response did not address PNM's assertion that TCA breached its duty to require its subcontractors to comply with the insurance requirements of the Purchase Agreement. Likewise, TCA did not address this issue in its Motion for Summary Judgment. Summary judgment is granted to PNM on this claim.

13

5.      *TCA's request pursuant to Fed. R. Civ. P. 56(f) will be denied.*

TCA filed a Rule 56(f) affidavit requesting that summary judgment be denied on the grounds that it needs additional discovery.  TCA Response, Ex. A (Affidavit).   The affidavit failed to meet the well-established standards regarding Fed.R.Civ.P. 56(f).   In accordance with the standards established in the Tenth Circuit, a Rule 56(f) motion must be supported by an affidavit, which contains the following information:

> (1) the nature of uncompleted discovery, such as what facts are reasonably expected to create a genuine issue of material fact; (2) the manner by which the facts are reasonably expected to create a genuine issue of material fact; (3) the efforts affiant has made to obtain those facts; and (4) the reasons these efforts were unsuccessful.

11 James Wm. Moore, et al., *Moore's Federal Practice*, § 56.10[8][c] (3d ed. 2004) (*citing Adams v. Goodyear Tire & Rubber Co.*, 184 F.R.D. 369, 373-4 (D. Kan. 1998).

The Affidavit fails to specify the facts that would create a genuine issue of material fact.  The Affidavit does not explain how the discovery sought would preclude summary judgment. *Onyon v. Truck Ins. Exch.*, 859 F. Supp. 1338, 1343 (W.D. Wash. 1994) (denying request for additional discovery under Rule 56(f) where party failed to show what discovery he sought and how that discovery would preclude summary judgment.)  Moreover the Affidavit lists only general areas of discovery that TCA is seeking.  For instance, TCA requests discovery regarding "PNM's contract management programs and processes" and "PNM's waiver of contractual requirements by its statements and conduct over the years...."

The Affidavit also fails to demonstrate what efforts have been made to obtain the discovery sought or indicate the reasons the efforts it took to obtain discovery were unsuccessful.  This failure is also a basis for denying additional discovery. *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*,

14

945 F. Supp. 693, 706 (S.D.N.Y. 1996) ("[W]here a party makes no reference to the third and fourth...factors – its efforts to obtain discovery and why those efforts were unsuccessful – a Rule 56(f) request may be denied.").

Finally, the Court notes that TCA filed a cross-motion on summary judgment on the same issues as PNM's Motion for Summary Judgment. By filing its motion for summary judgment, TCA acknowledged and asserted that the issues on which the Court is ruling were ripe for decision. *Filiatrault v. Comverse Tech., Inc.*, 275 F.3d 131, 138 (1st Cir. 2001) (recognizing that filing of a cross-motion for summary judgment "almost always indicates that the moving party was not prejudiced by lack of discovery."). TCA can't have it both ways.

**IT IS THEREFORE ORDERED** that Third Party Defendant Thatcher Company of Arizona's Motion for Summary Judgment [Docket No. 94] is denied and Defendants/Third Party Plaintiffs Public Service Company of New Mexico and Chuck Arater's Motion for Summary Judgment against Third Party Defendant Thatcher Company of Arizona [Docket No. 111] is granted in part as follows:

a. TCA's refusal to defend and indemnify PNM for operations performed pursuant to the Purchase Agreement is a breach of the terms of the Purchase Agreement. Summary Judgment is granted to PNM on this issue;

b. TCA's duty to indemnify PNM included any negligence by PNM that occurred in the course of operations being conducted pursuant to the Purchase Agreement. Summary Judgment is granted to PNM on this issue;

c. TCA's failure to purchase and maintain comprehensive general liability insurance covering PNM is a beach of the Purchase Agreement. Summary Judgment is granted to PNM on this

issue;

d.  The original Thatcher Trust Agreement of 1986 was the only trust agreement in effect on the date of the accident and it failed to satisfy the terms of the Purchase Agreement regarding insurance or its equivalent.   Therefore, TCA breached this duty under the Purchase Agreement.  Summary Judgment is granted to PNM on this issue;

e.  TCA failed to require that its subcontractors complied with the insurance requirements and therefore TCA breached this duty under the Purchase Agreement.  Summary Judgment is granted to PNM on this issue; and

f.  TCA's affirmative defenses of wavier, estoppel, ratification and lack of mutual assent are stricken.

**ALAN C. TORGERSON**
**UNITED STATES MAGISTRATE JUDGE,**
**PRESIDING**